United States District Court
Southern District of Texas
**ENTERED**
August 18, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OSCAR OCHOA, III,<br>(TDCJ # 2450859; SPN # 02876115), | § § § | |
| *Plaintiff*, | § § | |
| vs. | § § | CIVIL ACTION NO. H-23-3355 |
| HARRIS COUNTY SHERIFF<br>DEPUTIES, *et al.*, | § § § | |
| *Defendants*. | § § | |

## MEMORANDUM OPNION AND ORDER

Plaintiff Oscar Ochoa, III, sued Harris County and Harris County Jail Detention Officers Ricardo Marron, Demitre Johnson, Samuel Gamez, and Brandon Brezik under 42 U.S.C. § 1983, alleging that they violated his constitutional rights while he was a pretrial detainee at the Jail. (Dkt. 9). The Court has dismissed all of the defendants except Marron. (Dkts. 23, 30). Marron has now filed a motion for summary judgment, supported by numerous attachments. (Dkts. 42, 43). Ochoa filed a response, which is also supported by numerous exhibits. (Dkts. 44, 45). Marron filed a timely reply. (Dkt. 47). Having reviewed Marron's motion, the response and reply, the parties' exhibits, the record, and the law, the Court denies the motion for summary judgment for the reasons explained below.

## I.   **BACKGROUND**

In April 2022, Ochoa was a pretrial detainee in the Harris County Jail. According to his sworn statement given as part of the Harris County Internal Affairs investigation, Ochoa visited with his father on April 7, 2022. (Dkt. 44-1, p. 1). As he was returning to his cellblock after that visit, he stopped to talk with another inmate through a cell door. (*Id.*). A detention officer—later determined to be Johnson—stopped Ochoa as he was talking, searched him, took his Nike Air Max shoes, and then placed him in a holding cell. (*Id.*). Ochoa fell asleep in the holding cell. (*Id.*).

When Ochoa woke up, Johnson came back and told him that he needed to return to his cellblock. (*Id.*). Johnson began to walk Ochoa, who was not handcuffed, to the 3F1 cellblock where Ochoa was assigned. (*Id.*). As they walked, Ochoa asked when his shoes would be returned, and Johnson said the shoes would not be returned because they were contraband. (*Id.*). When Ochoa protested that he had purchased the shoes, Johnson put his hand on Ochoa's chest and pushed him against the wall. (*Id.*). Ochoa told Johnson to take his hands off him, and Johnson responded, "What are you going to do if I don't?" (*Id.*). Other officers, including Marron, approached and Johnson then asked, "Do you know what the vestibule is?" (*Id.*). Ochoa responded that "I know what it is and I know what y'all do there." (*Id.*).

2/ 30

The "vestibule" is a small, locked space between the main hallway and the entrance to a cellblock. (Dkt. 44-2, p. 2). A locked door from the hallway leads into the vestibule. (*Id.*) Another locked door across from the hallway door leads into the cellblock. (*Id.*) The vestibule functions as a sallyport of sorts between the hallway and the cellblock, and the door to the cellblock will not open until the door to the hallway is closed. (*Id.* at 4-6). There is evidence that these vestibules have been used by detention officers as a place to assault detainees because the vestibules have no cameras. (Dkts. 44-2, pp. 2-3; 48).

After the exchange about the vestibule, Johnson released Ochoa, and Ochoa began walking toward his cellblock. (Dkt. 44-1, p. 1). Apparently neither Johnson nor any other officer believed that Ochoa needed to be restrained, and he walked toward his cellblock without handcuffs or even an arm hold. (*Id.*). When the group got to the cellblock, the door from the hallway into the vestibule opened. (*Id.*). Marron entered first. (*Id.*). Ochoa followed him and faced the opposite wall where the door to the cellblock was. (*Id.*). Marron was on Ochoa's left side. (*Id.*). Johnson stepped in front of Ochoa and turned to face him. (*Id.*). While Ochoa had his hands behind his back, Johnson slapped Ochoa across the face. (*Id.*). Ochoa laughed, at which point Marron punched Ochoa four times on the left side of his head. (*Id.*). Another officer who was behind Marron said, "that's enough, that's enough" and grabbed Ochoa to keep him from falling to the ground. (*Id.* at 1-2). Another officer

then handcuffed Ochoa and escorted him to the medical clinic. (*Id.* at 2). The clinic "cleaned up" Ochoa and sent him back to the holding cell. (*Id.*). The next morning, Ochoa was transferred to a new cellblock. (*Id.*). When Ochoa's nose continued to bleed, he was taken back to the clinic and then to Ben Taub Hospital for further evaluation. (*Id.*).

Ochoa's deposition contains some additional information. (Dkt. 42-3). In his deposition, Ochoa testified that after a visit with his father, he was walking back to his dorm. (*Id.* at 15). He pushed the button to re-enter his dorm, but the officer in charge of operating the door was sleeping and did not see or hear him. (*Id.*). As Ochoa waited for the door to open, another inmate called to him from another door. (*Id.* at 15-16). As Ochoa turned to that inmate, Johnson arrived in the area. (*Id.* at 16). Johnson called Ochoa over, apparently believing that Ochoa was out of place. (*Id.*). Ochoa went to Johnson, Johnson searched him for contraband, took his shoes, and placed him in a holding cell, where Ochoa fell asleep. (Id. at 16-17).

When Ochoa awakened, Johnson was there again and told Ochoa that he needed to return to his dorm. (*Id.*). At that point, Ochoa asked about his shoes. (*Id.* at 18). Ochoa testified that he has pre-existing foot issues that are aggravated if he does not wear shoes. (*Id.*). When Ochoa tried to tell Johnson that he needed his shoes, Johnson told him that he was not getting his shoes back and that he would have to walk back to his dorm in his socks. (*Id.* at 18-19). Ochoa told Johnson that

he had purchased the shoes and brought them with him to jail and that he had been allowed to have them for over two years. (*Id.* at 18-20). Despite this, Johnson told Ochoa that his shoes had been confiscated as contraband and would not be returned. (*Id.*).

As Johnson began walking Ochoa to his dorm, Ochoa told Johnson that he would file a grievance about having his shoes confiscated. (*Id.* at 19). Johnson responded by pushing Ochoa up against the hallway wall. (*Id.*). Ochoa then asked to speak with a shift supervisor or sergeant about his shoes. (*Id.* at 22). Johnson denied this request. (*Id.*).

When Johnson pushed Ochoa against the wall, other officers, including Marron, Brezik, and Gamez, came to assist Johnson. (*Id.* at 23). By that time, Johnson had put his hand on Ochoa's chest. (*Id.*). Ochoa told Johnson that there was no reason for Johnson to touch Ochoa, and he told Johnson to "get your hands off me." (*Id.*). Johnson replied, "What are you going to do if I don't?" (*Id.*). During that exchange, Marron was standing behind Johnson, using mannerisms and facial expressions to try to provoke Ochoa into violence. (*Id.* at 24). While that was going on, Johnson asked Ochoa if he knew what the vestibule was. (*Id.* at 25). Ochoa responded that he did and that he knew what "y'all like to do in there." (*Id.*). Johnson released Ochoa, and Ochoa continued walking toward his cellblock with the officers walking behind him. (*Id.*)

When they got to the vestibule, Ochoa walked in, keeping his hands behind his back. (*Id.*). He did not argue or threaten any of the officers, although he did continue to ask to speak with a shift supervisor about his shoes. (*Id.* at 31-32). Johnson then slapped Ochoa across the face and, immediately after that, Marron struck him repeatedly with his fist. (*Id.* at 25-26, 29). Marron then laughed at Ochoa and asked whether he "hit hard." (*Id.* at 32). Ochoa testified that he believes Johnson slapped him because he thought that Ochoa had been disrespectful by asking to speak with a supervisor. (*Id.* at 35). Ochoa testified that Marron struck him for no reason at all. (*Id.*). After the assault, Ochoa was escorted to the clinic, and he was later taken to the hospital. (*Id.* at 39).

Both parties submitted video footage from the hallway on the night of the incident in support of their positions. (Dkts. 42-1, 42-12, 48). These videos show Johnson standing at the door of the holding cell waiting for Ochoa to come out. When Ochoa leaves the holding cell, he is not handcuffed and he is not wearing either shoes or Jail-issued slides. Ochoa walks down the hallway toward his cellblock with his arms by his sides and Johnson following several feet behind. The video does not have audio, but it is clear that Ochoa is talking or yelling.

At one point, Ochoa stops, turns around, and takes a few steps back toward Johnson. Johnson immediately pushes Ochoa against the wall and holds his hand on Ochoa's chest. Within seconds, four other officers come to the hallway and

surround Johnson and Ochoa. After less than a minute, Johnson removes his hand from Ochoa and lets him move away from the wall. Ochoa then resumes walking in the direction of his cellblock. Ochoa is surrounded by the officers, but he is not handcuffed or otherwise restrained and he does not make any threatening movements. It is clear from the video that he is still talking.

The video does not capture any of the events inside the vestibule, but it does show Ochoa being led away from the vestibule after the assault. Ochoa is now handcuffed, and he is brought into the elevator by only one officer. Ochoa's nose is bleeding, and there is a large amount of blood down the front of his shirt. No other injuries are visible in the footage.

Marron prepared a Use-of-Force report the night of the incident, in which he stated that when Ochoa entered the vestibule, Ochoa "immediately planted both of his feet and tried to assault Detention Officer Johnson and Detention Officer Garry with a closed left hand strike but was unsuccessful." (Dkt. 45-6, p. 3). Marron reported that he struck Ochoa twice with a closed fist on his left cheek to gain compliance with his orders to place his hands behind his back. (*Id.*). Marron reported that despite the orders and punches, Ochoa continued to resist and continued to try to assault the officers. (*Id.*).

On February 3, 2023, Marron gave a sworn statement as part of the Internal Affairs investigation. (Dkts. 42-11; 45-7). In that statement, Marron said that he

heard Ochoa yelling at Johnson as Ochoa and Johnson approached the third-floor Floor Control Center. (Dkt. 42-11, p. 2). Marron joined Johnson, Gamez, and Garry in walking Ochoa back to his cellblock. (*Id.*). As they were walking, Johnson asked Ochoa if he knew what happens in the vestibule. (*Id.*). Ochoa turned and faced Johnson and said something along the lines of, "I'll beat your ass." (*Id.*). Marron responded in kind and admitted that he and Ochoa were yelling and cussing at each other as they approached the vestibule. (*Id.*).

Ochoa entered the vestibule and stopped with his back to the wall. (*Id.*). The officers entered the vestibule, with Marron on Ochoa's left and Johnson and Garry on Ochoa's right. (*Id.*). Marron states that Ochoa was still yelling and "his hands were by his side but he was moving them up and down and side to side as he talked." (*Id.*). Marron felt threatened, so he struck Ochoa twice – once with his left hand and once with his right. (*Id.* at 2-3). Despite these punches, Ochoa continued to yell and bicker with Marron. (*Id.* at 3). After that, other officers handcuffed Ochoa. (*Id.*). Marron did not recall Ochoa striking any officer or any other officer striking Ochoa. (*Id.*).

Both parties have supported their positions with sworn statements given by each of the other officers as part of the Internal Affairs investigation. Detention Officer Demitre Johnson stated in his sworn statement that Ochoa became angry when Johnson confiscated his shoes before placing him in the holding cell. (Dkts.

42-10, p. 2; 45-4).  Later, Johnson went back to the holding cell to walk Ochoa back to his cellblock.  (Dkt. 42-10, p. 2).  As Johnson walked behind Ochoa, Ochoa was threatening to fight with him.  (*Id.*).  Officers Marron, Brezik, Garry, and Gamez came over to help him with Ochoa.  (*Id.*).

When the group got to the vestibule, Garry and Marron entered, along with Johnson and Ochoa.  (*Id.*).  The door from the vestibule to the hallway closed, but the door from the vestibule into the cellblock did not open.  (*Id.*).  Marron grabbed Ochoa's shoulder and turned him toward the wall, but Ochoa pulled away.  (*Id.*). Ochoa started to explain why he was in holding, and he was talking with his hands, pointing toward the cell, and pointing toward the hallway.  (*Id.*).  Ochoa's hands were near Marron's face, and Marron ordered Ochoa to keep his hands down more than once.  (*Id.*).  Johnson said that he wanted to leave the vestibule "because I have seen situations like this with Detention Officer Marron turn bad."  (*Id.*).  As Johnson started to leave, he saw Ochoa's hand come toward the right side of his head.  (*Id.* at 2-3).  Johnson heard Marron say, "Oh, you trying to hit my boy?"  (*Id.* at 3). Johnson turned and saw Marron strike Ochoa four or five times in the ribs and head. (*Id.*).  Garry and Johnson then grabbed Ochoa and placed him in handcuffs.  (*Id.*).

Detention Officer Brandon Brezik stated in his sworn statement that he was standing at the North Sergeants' Office on the third floor of the Jail when he heard Ochoa threaten to "whoop" Johnson.  ((Dkts. 42-5, p. 1; 44-6).  Brezik walked over

and joined Johnson, Marron, Garry, and Gamez in walking Ochoa to his cellblock. (Dkt. 42-5, p. 1). As they walked, Brezik could hear Marron and Ochoa "bickering back and forth." (*Id.*).

When they arrived at the vestibule, Marron entered first. (*Id.*). Ochoa entered next, with Garry, Johnson, and Brezik entering behind them. (*Id.*). Ochoa was facing the cell door, Garry and Johnson were side-by-side behind him, and Marron was to Ochoa's left. (*Id.*). Ochoa "quickly turned around," and Marron struck Ochoa twice on the right side of his head. (*Id.*). Brezik, stated, "Stop, that's enough." (*Id.*). Ochoa laughed and said, "My girl hits harder than that." (*Id.*). Garry pushed Ochoa against a wall and ordered him to place his hands behind his back. (*Id.*). When Ochoa tried to push away from the wall, Garry slapped Ochoa once in the face. (*Id.*). After the slap, Ochoa placed his hands behind his back and allowed Gamez to handcuff him. (*Id.* at 1-2). Brezik also did not see Ochoa try to strike any of the detention officers, nor did he see Johnson slap Ochoa. (*Id.* at 2).

Detention Officer Shawn Garry stated in his Internal Affairs interview that he was walking with Ochoa from the holding cell to his cellblock along with Marron, Johnson, Gamez, and Brezik. (Dkts. 42-9, p. 2; 44-4). As they walked, Marron and Ochoa "yelled and cussed at each other." (Dkt. 42-9, p. 2). When they got to the vestibule, Ochoa entered and had his back to the wall. (*Id.*). Johnson and Marron were to Ochoa's left, with Marron between Johnson and Ochoa. (*Id.*). Garry was

directly in front of Ochoa. (*Id.*). Johnson started to leave the vestibule while Ochoa and Marron continued to yell at each other. (*Id.*). Ochoa was "talking with his hands," but as he put his hands behind his back, Marron struck Ochoa in the face four or five times. (*Id.*). Ochoa's knees buckled, and Marron grabbed Ochoa and turned him toward the wall. (*Id.*). Garry then pushed Ochoa against the wall and handcuffed him. (*Id.*). The officers then led Ochoa out of the vestibule and turned him over to Detention Officer Brown to be escorted to the clinic. (*Id.* at 2-3). Garry states that Ochoa did not pose a threat to either Johnson or Marron at any time, and he did not see any officer strike Ochoa except Marron. (*Id.* at 3).

Detention Officer Samuel Gamez stated in his sworn statement that he was in the Floor Control Center hallway when he heard Ochoa threaten Johnson, although he did not hear exactly what was said. (Dkts. 42-7, p. 2; 45-1). Johnson, Garry, Marron, and Gamez stopped Ochoa and warned him not to threaten them again. (Dkt. 42-7, p. 2). They then walked with Ochoa into the vestibule, where Ochoa "verbally threatened us," although Gamez did not recall specifically what Ochoa said. (*Id.*). Ochoa was standing with his arms down by his sides. (*Id.*). Marron told Ochoa that it was not a good idea to threaten the officers, and he then struck Ochoa two times in the face. (*Id.*). The other officers then grabbed Ochoa's arms, handcuffed him, and took him out of the vestibule to go to the clinic. (*Id.*). Gamez did not see Ochoa move his arms or swing at any officer at any time. (*Id.*).

11/ 30

The Internal Affairs investigative report, which Ochoa offered in opposition to the summary judgment motion, determined that the use of force against Ochoa was "not within policy." (Dkt. 45-1, p. 11). The case was referred to the Harris County District Attorney's Office, which resolved the matter after Johnson, Marron, and Garry resigned their positions. (*Id.* at 12). None are eligible to be rehired. (*Id.*).

In his motion for summary judgment, Marron argues that he is entitled to judgment in his favor because "his conduct did not violate Ochoa's constitutional rights. (Dkt. 42, p. 7). He contends that an analysis of the factors identified in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), shows that the force he used was not constitutionally excessive. (*Id.* at 9). He also contends that because there was no constitutional violation, he is entitled to qualified immunity. (*Id.* at 7).

In response, Ochoa argues that genuine issues of material fact preclude the entry of summary judgment. (Dkt. 44). Marron filed a reply, which relies on only his statements and those of Johnson to argue that the evidence shows that he did not use excessive force and so is entitled to summary judgment. (Dkt. 47).

## II.   **THE SUMMARY JUDGMENT STANDARD**

Marron's motion for summary judgment is considered under Federal Rule of Civil Procedure 56. "Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton,* 572 U.S. 650, 656-57 (2014) (per

curiam) (quoting FED. R. CIV. P. 56(a)). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-25 (1986)). "A fact is material if its resolution could affect the outcome of the action." *Dyer v. Houston,* 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 134 (5th Cir. 2010)). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (per curiam) (cleaned up).

When considering a motion for summary judgment, the Court must view all evidence and draw all inferences "in the light most favorable to the [nonmoving] party." *Tolan*, 572 U.S. at 657 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); *see also Dyer*, 964 F.3d at 380. When both parties have submitted evidence that tends to show conflicting facts, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Willis v. Roche Biomedical Labs., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995). However, if record evidence clearly contradicts a party's version of events, the Court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Waddleton v. Rodriguez*, 750 F. App'x 248, 253-54 (5th Cir. 2018) (per curiam)

13/ 30

(quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Further, the Court will not consider the nonmoving party's conclusory allegations and unsubstantiated assertions as evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). After viewing the offered evidence in the light most favorable to the nonmoving party, summary judgment may be granted only if no genuine disputes of fact exist and no reasonable jury could return a verdict for the nonmoving party. *See, e.g., Rubinstein v. Adm'rs of the Tulane Educ. Fund,* 218 F.3d 392, 399 (5th Cir. 2000).

## III.   DISCUSSION

### A.    The Request to Strike Marron's Motion for Summary Judgment

In his response to Marron's motion, Ochoa asks the Court to strike the summary-judgment motion as untimely filed. (Dkt. 44, p. 2). In his reply, counsel for Marron explains that when he attempted to upload the motion onto the Court's CM/ECF system on June 18, 2025—the due date—the filing was rejected. (Dkt. 47, pp. 7-8). After several tries, counsel discovered that one of the exhibits was too large, which was preventing the file from uploading. (*Id.* at 8). Counsel resized the exhibit, and the motion with its exhibits was filed on June 19, 2025, at 12:24 a.m. (*Id.*).

Federal Rule of Civil Procedure 6(b)(1)(B) permits the Court to extend time even after the original time has expired when the party failed to timely act due to

"excusable neglect." The "excusable neglect" standard permits courts to accept late filings "caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993); *see also Adams v. Travelers Indem. Co.*, 465 F.3d 156, 161 n.8 (5th Cir. 2006) (applying the *Pioneer* standard for excusable neglect to consideration of a Rule 6(b) motion).

While the Court does not condone waiting until just before midnight on the due date to file motions, the Court finds that counsel's 24-minute delay in filing the motion due to a technical issue with the Court's CM/ECF system was a circumstance beyond counsel's control that qualifies as excusable neglect. The Court also finds that this technical issue qualifies as good cause under the Court's scheduling order. Notably, Ochoa does not allege that he was prejudiced by this brief delay in filing the motion or its exhibits. Ochoa's request to strike Marron's motion for summary judgment, included in his response to the summary-judgment motion, is **denied**.

### B.    The Excessive Force Claim

Ochoa has sued Marron based on his alleged use of excessive force during the events of April 7. Pretrial detainees like Ochoa have the right under the Fourteenth Amendment's Due Process Clause to be free from the use of excessive force. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). "Force against a pretrial detainee is 'excessive' and a violation of the Fourteenth Amendment when the force

was objectively unreasonable." *Fairchild v. Coryell Cnty., Tex.*, 40 F.4th 359, 362 (5th Cir. 2022) (citing *Kingsley*, 576 U.S. at 396-97); *see also Lombardo v. City of St. Louis, Mo.*, 594 U.S. 464, 466 (2021) (per curiam).  Whether the force applied is objectively unreasonable "turns on the 'facts and circumstances of each particular case,'" and the Court considers reasonableness from the perspective of a reasonable officer on the scene. *Kingsley,* 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386 (1989)).  The Court looks only at the objective reasonableness of the force used rather than any underlying intent or motivation on the part of the officers. *See Graham*, 490 U.S. at 397.

Factors to consider regarding the reasonableness of the force used include "the relationship between the need for force and amount of force used; the extent of the plaintiff's injury; any effort made to temper or limit the amount of force; the severity of the security problem at issue; the threat perceived by the officer; and whether the plaintiff was actively resisting." *Lombardo,* 594 U.S. at 467 (quoting *Kingsley,* 576 U.S. at 397).  In addition, the Court considers the legitimate governmental interests in managing the facility and the policies and practices that, in the jail officials' judgment, are necessary to preserve order and discipline and to maintain institutional security. *See Kingsley,* 576 U.S. at 397 (citing *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)).

Although reasonableness is considered from the perspective of a reasonable

officer at the scene, that does not mean that the Court automatically accepts the officer's testimony about what happened and the need for the use of force. *See Tolan*, 572 U.S. at 657. When considering a motion for summary judgment, the Court must view all of the evidence in favor of the nonmoving party and determine whether, if the facts are construed in the nonmoving party's favor, the force used was objectively reasonable. *See Scott*, 550 U.S. at 378. If "a jury could reach different conclusions on a number of facts that impact the reasonableness calculus," and if the resolution of those factual disputes in favor of the nonmoving party could show that the force used was objectively unreasonable, summary judgment is inappropriate. *See Fairchild*, 40 F.4th at 363. Because Marron is the moving party, the Court will construe the disputed evidence in favor of Ochoa and then consider whether under that version of the facts, a jury could find that the force used was objectively unreasonable.

The incident in question began with a dispute between Johnson and Ochoa over Ochoa's confiscated shoes. As Johnson was walking Ochoa back to his cellblock, Ochoa stopped, turned to face Johnson, and continued a verbal dispute with him. A jury could find that Ochoa's act of turning around to confront Johnson constituted resistance to Johnson's order to Ochoa to return to his cellblock, but the video evidence shows that any such resistance was neither physically threatening nor violent. Instead, it was a verbal altercation that temporarily slowed Ochoa's

progress toward his cellblock. A jury could also reasonably find from the video evidence that Ochoa's resistance ended when Johnson pushed him against the wall and when the other officers arrived at the scene. Marron's contention that Ochoa continued to resist the order to return to his cellblock after that time is directly contradicted by the video evidence, and the Court will not adopt a version of the facts that is clearly contradicted by the video evidence. In addition, a jury could find that the officers' decision to allow Ochoa to continue walking to his cellblock without handcuffs or any other restraint—even after the confrontation against the hallway wall—shows that Ochoa had been subdued, his resistance had ended, and he did not pose a threat to the officers or Jail security at that point.

No video evidence exists to document the events that occurred inside the vestibule, and the statements from the five witnesses vary significantly. On the night of the incident, Marron prepared a Use-of-Force report in which he stated that Ochoa swung at Johnson and Garry with closed fists. Ten months later in his sworn statement, Marron reported only that Ochoa was "moving his hands" and that he felt threatened. Johnson partially corroborates Marron's initial statement, saying that he saw Ochoa's right hand moving toward Johnson's face as Johnson was trying to leave the vestibule. But Garry stated in his sworn statement that Ochoa was only "talking with his hands," that he did not swing or strike at anyone, and that he did not pose a threat to any of the officers. Brezik and Gamez both swear that Ochoa

18/ 30

had his hands down, did not attempt to swing at or hit anyone, and did not pose a threat to any of the officers.  Gamez also stated that Marron punched Ochoa without warning.

How the jury resolves these factual disputes affects the analysis of whether Marron's use of force was objectively reasonable.  Because the Court must construe the facts in the light most favorable to the nonmoving party—Ochoa—at summary judgment, the Court considers the *Kingsley* factors based on the version of events that would exist if the jury resolved every dispute in favor of Ochoa.

### 1.    The severity of the security problem and the threat perceived by the officers.

Jail officials are justified in using some degree of force "in a good-faith effort to maintain or restore discipline" when a prisoner refuses to cooperate with an official's legitimate orders. *Sanchez v. Griffis*, 569 F. Supp. 3d 496, 510 (W.D. Tex. 2021) (quoting *Gonzales v. Rowe*, No. 5:20-CV-052-BQ, 2020 WL 4811005, at *3 (N.D. Tex. July 27, 2020)).  But a jury could reasonably find from the summary-judgment evidence that the severity of the initial security problem was low.  The initial threat perceived by Johnson was Ochoa disobeying the order to return to his cellblock.  The undisputed video evidence shows that Johnson dealt with this threat by pushing Ochoa against the wall and exchanging words with him.  After the arrival of additional officers, Johnson apparently believed that the security problem had

been resolved and the threat had subsided because he released Ochoa to continue walking, unhandcuffed, back to his cellblock.   While Ochoa appears to have continued verbally complaining about his shoes, the video evidence does not show him resisting the officers' orders in any way.   Nothing in the summary judgment evidence shows that Ochoa did anything to escalate the situation or engage in further resistance before he entered the vestibule.   From this evidence, a jury could reasonably find that the security problem posed by Ochoa's noncompliance with the order to return to his cellblock was resolved and that the officers viewed any remaining threat as so low that neither handcuffs nor even an arm grip were considered necessary.

But resolution of the factual disputes about exactly what happened in the vestibule will determine whether Marron's use of force was reasonable.   If the jury were to find that the only threat Ochoa posed resulted from his bickering with Johnson and the brief confrontation along the way to the cellblock, Marron's use of force in the vestibule would be unreasonable because a perceived security threat cannot justify the use of force beyond the time when that threat has subsided.   *See Fairchild*, 40 F.4th at 366; *see also Timpa v. Dillard*, 20 F.4th 1020, 1029 (5th Cir. 2021) ("[W]hen a subject has been subdued—meaning, he lacks any means of evading custody and does not pose a threat of immediate harm—the further use of force is not justified.").   But if the jury were to find that some event occurred in the

20/ 30

vestibule that created a renewed threat to officer safety, the use of additional force may have been justified.  Considering the evidence in the light most favorable to Ochoa, as is required at this stage of the proceedings, this *Kingsley* factor weighs in favor of finding the use of force objectively unreasonable.

### 2.    Whether Ochoa was actively resisting

Marron contends that there is evidence that Ochoa actively resisted lawful orders throughout the entire walk through the hallway and into the vestibule and that this resistance warranted the use of force in the vestibule.  But a jury could find from the video evidence that Ochoa stopped any active resistance once Johnson forced him against the wall.  After that time, the jury could find that Ochoa complied with Johnson's order and freely walked—without being handcuffed or otherwise restrained—to the entrance of his cellblock.

In addition, factual disputes exist as to whether Ochoa renewed his resistance in the vestibule or whether Marron punched him as punishment for his earlier resistance.  If a jury were to find that Ochoa renewed his resistance to the officers once they entered the vestibule, Marron's use of force may have been objectively reasonable.  But if the jury were to find that Ochoa was no longer resisting and that Marron punched him as punishment for the earlier resistance, his actions would be objectively unreasonable.  As the Fifth Circuit has explained, "Force must be reduced once a suspect has been subdued" and "summary judgment is inappropriate

when the timing of the officer's force may or may not have corresponded to the timing of the subject's resistance." *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020).

Because the Court must consider the *Kingsley* factors by viewing the evidence in favor of Ochoa at this stage of the proceedings and because there is a view of the evidence that would show that the Ochoa had been subdued and was no longer actively resisting when Marron punched him, the Court considers this *Kingsley* factor as weighing in favor of finding the use of force objectively unreasonable.

### 3. Any efforts to limit or temper the use of force

The only evidence on this factor is the sworn testimony from Gamez that Marron punched Ochoa without warning while Ochoa had his hands by his sides and posed no threat to any of the officers. No summary judgment evidence shows that Marron took any steps to limit or temper his use of force once in the vestibule. Because the Court must consider the *Kingsley* factors by viewing the evidence in favor of Ochoa at this stage of the proceedings and because there is no evidence that Marron took any steps to temper or limit the use of force, the Court considers this *Kingsley* factor as weighing in favor of the force being objectively unreasonable.

### 4. The extent of Ochoa's injuries

Ochoa alleges that he suffered a bloody nose, cuts and bruises and a split lip, swelling around his left eye, and swelling and injuries to his left ear because of the

punches by Marron. The video evidence of Ochoa being escorted to the medical clinic shows that his nose is bleeding and there is blood down the entire front of his shirt. (Dkt. 48). Ochoa's medical records show that after his initial assessment at the medical clinic, he was transferred to Ben Taub Hospital for further assessment and x-rays. (Dkt. 44-3). Those records show that the area around his left eye area was bruised and swollen, he had suffered a nosebleed, and his hearing was decreased in his left ear, but there were no broken bones. (*Id.* at 3-4). The hospital prescribed ibuprofen for his pain. (*Id.* at 4).

While Ochoa's injuries may not be characterized as significant, a jury could find that these multiple injuries that ultimately required evaluation at a public hospital are more than *de minimis*. *See Gomez v. Chandler,* 163 F.3d 921, 924 (5th Cir. 1999) (noting that while a detainee must have suffered more than a *de minimis* injury to support a claim for excessive force, "there is no categorical requirement that the physical injury be significant, serious, or more than minor"). Further, courts are to "decide excessive force claims based on the nature of the force rather than the extent of the injury." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Because the Court must consider the *Kingsley* factors by viewing the disputed evidence in favor of Ochoa at this stage of the proceedings and because there is some evidence from which a jury could find that Ochoa's injuries were more than *de minimis*, the Court considers this *Kingsley* factor as weighing in favor of finding the

use of force objectively unreasonable.

### 5. The relationship between the need for force and the force used

The Fifth Circuit has described this final *Kingsley* factor as the "core of the excessive force injury: Was the amount of force proportional to the need for force?" *Fairchild*, 40 F.4th at 366 (citing *Kingsley*, 576 U.S. at 397). The need for force must be assessed based on the circumstances that existed at the time the force was applied. *Id.* at 367. Therefore, "a use of force that may begin as reasonably necessary in order to obtain compliance may cease to be so as a suspect becomes more compliant." *Tucker v. City of Shreveport*, 998 F.3d 165, 181-82 (5th Cir. 2021); *see also Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.").

A jury could find based on the video evidence that Ochoa's initial resistance ceased after Johnson pushed him against the wall. But a jury could find based on Marron and Johnson's statements that Ochoa began swinging his arms inside the vestibule and so posed a renewed threat to the officers. If the jury made such a finding, it could determine that the use of some force to stop Ochoa's resistance and ensure officer safety was appropriate. On the other hand, the jury could find based on the statements by Ochoa, Brezik, Garry, and Gamez that there was no need for

force to be used against Ochoa in the vestibule. Because the Court must consider the *Kingsley* factors by viewing the evidence in favor of Ochoa at this stage of the proceedings and because a jury could find that there was no need for any force to be used in the vestibule, the Court considers this *Kingsley* factor as weighing in favor of finding the use of force objectively unreasonable.

In sum, when the disputed evidence is viewed in Ochoa's favor, consideration of the *Kingsley* factors shows that the Marron's use of force in the vestibule was objectively unreasonable. And because a jury could find, based on its resolution of the disputed evidence, that the use of force was objectively unreasonable, Marron is not entitled to summary judgment on his claim that he did not violate Ochoa's constitutional rights.

C.    **The Defense of Qualified Immunity**

In the alternative, Marron contends that even if there are genuine disputes of material fact concerning whether he violated Ochoa's constitutional rights, he is nevertheless entitled to summary judgment on his defense of qualified immunity.

"Qualified immunity protects officers from suit unless their conduct violates a clearly established right." *Austin v. City of Pasadena, Tex.*, 74 F.4th 312, 322 (5th Cir. 2023) (quoting *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003)); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The test for qualified immunity involves two steps: first, the Court considers "whether the undisputed facts

and the disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right," and second, the Court considers "whether the defendant's conduct was objectively reasonable in light of clearly established law." *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) (cleaned up). When the qualified immunity defense is raised, the plaintiff has the burden to negate it. *See Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017). But when a defendant moves for summary judgment based on the defense of qualified immunity, he "must be prepared to concede the best view of the facts to the plaintiff." *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007) (quoting *Gonzales v. Dallas County*, 249 F.3d 406, 411 (5th Cir. 2001)).

The best view of the evidence presented by the parties in this case is that Ochoa had stopped resisting Johnson's orders to return to his cellblock, that he was neither resisting nor posing any threat to the officers once in the vestibule, and that Marron punched him with no warning and for no reason except to punish him for his earlier resistance. Under this view of the evidence, Marron violated Ochoa's constitutional rights by using excessive force. Therefore, the question of whether Marron is entitled to summary judgment based on qualified immunity depends on whether the law was clearly established in April 2022 that a pretrial detainee who was complying with orders and who did not pose a threat to officer safety had a clearly established right not to be punched by detention officers.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (cleaned up). Earlier cases involving "fundamentally similar" or "materially similar" facts "can provide especially strong support for a conclusion that the law is clearly established, [but] they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Instead, general statements of the law may give fair and clear warning, and "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Id.* Therefore, there can be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* at 740 (cleaned up). But the existing precedent "must be specific enough that it is clear to a reasonable [defendant] that his conduct was unlawful in the situation he confronted." *Fairchild*, 40 F.4th at 367 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)); *see also Boyd v. McNamara*, 74 F.4th 662, 669 (5th Cir. 2023) ("We have often explained that the law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." (quoting *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013))).

27/ 30

The Fifth Circuit has long held that the use of force on a restrained and subdued subject is objectively unreasonable. *See Timpa*, 20 F.4th at 1034 (collecting cases). While Ochoa was not restrained when this incident occurred, that seems to be because none of the five officers with him believed that any physical restraint was necessary. Further, if the jury were to accept Ochoa's version of the facts, it could find that his earlier resistance had been subdued and that he was complying with the officers' commands without resistance for several minutes. Under this version of the facts, clearly established law would put Marron on notice that his conduct in punching Ochoa would violate Ochoa's constitutional rights. *See, e.g., Bagley v. Guillen*, 90 F.4th 799, 803 (5th Cir. 2024) (finding that it was clearly established in May 2019 that an officer may not use force on a suspect who is complying with his commands); *Boyd*, 74 F.4th at 669 (collecting cases and noting that it has long been the law that after an inmate submits to the officers' authority, "there is no need, and thus no justification, for the further use of force"); *Newman v. Guedry*, 703 F.3d 757, 761-64 (5th Cir. 2012) (it is objectively unreasonable for an officer to injure a man whose "behavior does not rise to the level of active resistance"); *Mitchell v. Cervantes*, 453 F. App'x 475, 477 (5th Cir. 2011) (per curiam) (questions of fact precluded entry of summary judgment based on qualified immunity when the plaintiff's allegations showed that he was complying with the officers' orders at the

28/ 30

time the force was used).[1]  On the other hand, if the jury were to accept Marron's version of the facts, Fifth Circuit precedent would not put him on notice that his conduct was unconstitutional. *See, e.g., Griggs v. Brewer*, 841 F.3d 308, 315-16 (5th Cir. 2016) (an officer was entitled to qualified immunity from a claim that he punched an individual who was handcuffed when the evidence showed that the suspect was kicking and ignoring commands despite the restraints).

In his reply, Marron contends that Ochoa cannot rely on cases in which the prisoner or detainee was not resisting because Ochoa admitted in his deposition that he had resisted Johnson's commands to return to his cellblock.  There is also testimony from Marron that Ochoa continued resisting once he was in the vestibule. But because Marron has moved for summary judgment on the qualified immunity defense, he must accept the version of the facts that is most favorable to Ochoa— not the version most favorable to him.  And, as explained above, both video evidence and witness statements could permit a jury to find that Ochoa stopped resisting after Johnson pushed him against the wall and that he was not resisting in the vestibule. Under that view of the evidence, Marron's use for force violated clearly established

---

[1]While *Bagley* and *Newman* involve the analysis of excessive force claims under the Fourth Amendment, the Fifth Circuit has noted that the standard for excessive force is the same under either provision and that it has "previously relied on Fourth Amendment excessive force cases to determine whether a right had been clearly established for purposes of a Fourteenth Amendment excessive force claim." *Boyd*, 74 F.4th at 667, n.3.

law.

Because there are disputed issues of fact that are material to determining whether clearly established law put Marron on notice that his actions could violate Ochoa's constitutional rights, Marron is not entitled to judgment in his favor as a matter of law. His motion for summary judgment on the defense of qualified immunity must be denied.

## IV.    CONCLUSION

Based on the foregoing, the Court **ORDERS** as follows:

1.     Ochoa's request to strike Marron's Motion for Summary Judgment as untimely filed is **DENIED**.

2.     Marron's Motion for Summary Judgment, (Dkt. 42), is **DENIED**.

3.     The parties must continue to comply with the deadlines set forth in the Scheduling Order of December 19, 2024. (Dkt. 37).

The Clerk will provide a copy of this Order to the parties.

SIGNED at Houston, Texas on _____*August 15*_____, 2025.


_____
DAVID HITTNER
UNITED STATES DISTRICT JUDGE